# UNITED STATES DISTRICT COURT
for the
District of New Mexico

FILED
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The premise located at:<br>3707 12th St A1 NW, Albuquerque NM 87107 and other<br>items described in Attachment A. | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No. **24mr1660** |
|---|---|---|

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference

located in the _____ District of ___New Mexico___ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 922(a)(1), (g), (o) | Unlawful for any person to transfer or possess a machine gun |
| 18 U.S.C. §§ 933 | Trafficking in Firearms |
| 18 U.S.C. § 924(c)(1)(A)(i) | Using and Carrying a Firearm During and in Relation to a Drug Trafficking Crime |

The application is based on these facts:

See attached Affidavit in support of an application for a Search Warrant

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Katie M. Stamper, Special Agent, ATF
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ *(specify reliable electronic means)*.

Date: 09/11/2024

*Judge's signature*

City and state: Albuquerque, NM     HON. JOHN F ROBBENHAAR, U.S. Magistrate Judge
*Printed name and title*

United States of America
       V.
3707 12th St A1 NW, Albuquerque NM 87107

## SEARCH WARRANT AFFIDAVIT

1. Katie M. Stamper, a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being duly sworn, deposes and states:

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). I have been employed with ATF since March of 2020. I am an investigative, or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am an officer of the United States who is empowered by law to conduct investigations and make arrests for the offenses enumerated in Titles 18, 21, and 26 of the United States Code.

3. Through the ATF, I have received specialized training in the enforcement of federal firearms, explosives, and arson laws.  My training as an ATF Special Agent includes, but is not limited to: (1) the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the purchase, possession, distribution, and transportation of firearms and of the laundering and concealment of proceeds of firearms and drug trafficking; (2) surveillance; (3) analysis and processing of documentary, electronic, and physical evidence; (4) the legal and illegal purchase of firearms; and (5) the execution of arrest and search warrants seeking firearms, narcotics, and DNA.

4. The statements in this affidavit are based on my own investigation as well as information for other agents and law enforcement; information I have received from other agents and law enforcement personnel about their experience, training, and background; and my experience, training and background. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause for the requested warrant.

5. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant to search the premises at 3707 12th St A1 NW, Albuquerque NM 87107 (SUBJECT RESIDENCE) and does not set forth all of my knowledge about this matter.

### COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

6. As described herein and in Attachment B, this application seeks permission to search for evidence and records that might be found in the SUBJECT RESIDENCE, in whatever form they are found.  Some of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on computers, digital

media and other storage media (which includes cellular phones and tablets). For this reason, I submit that if a computer, digital medium, or storage medium is found in the SUBJECT RESIDENCE, there is probable cause to believe those records will be stored on that computer or storage medium. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

7. *Necessity of seizing or copying entire computers or storage media*. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data in the vehicle. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

    c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

8. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying computers and/or storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

9. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices to search and seizure pursuant to this warrant.  I seek this authority based on the following:

   a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

   b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

   c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

   d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

   e. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) Suspect to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the

  use of biometric features necessary to the execution of the search authorized by this warrant.

 f. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

 g. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Suspect Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

 h. Due to the foregoing, if law enforcement personnel encounter a device that is suspect to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the suspect premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## **PROBABLE CAUSE**

1. The United States, including ATF, has conducted a criminal investigation of Micah Maestas, Dominic Ramirez, Jesus Ruiz Salmeron, Oscar Ruiz Salmeron, and Daniel Garcia regarding possible violations of 18 U.S.C. §§ 922 (a)(1)(A) and 924: Dealing of Firearms Without a License; 18 U.S.C. § 2: Aiding and Abetting; 18 U.S.C. § 922(o):

4

Possession or Transfer of a Machinegun: 18 U.S.C. § 2: Aiding and Abetting; 21 U.S.C. §§ 841(a)(1), (b)(1)(C): Distribution of a Cocaine; 18 U.S.C. § 2: Aiding and Abetting; 18 U.S.C. § 924(c)(1)(A)(i):  Using and Carrying a Firearm During and in Relation to a Drug Trafficking Crime, and Possessing a Firearm in Furtherance of Such Crime; 18 U.S.C. § 2: Aiding and Abetting; 18 U.S.C. § 933(a)(1), (a)(3), and (b): Conspiracy to Commit Trafficking in Firearms; and 18 U.S.C. § 933(a)(1): Trafficking Firearms; 18 U.S.C. § 2: Aiding and Abetting.

2. In 2023, Albuquerque Police Department (APD) Detective Efrain Martinez identified an Instagram account, "yxng.shiner" which was linked to a telegram account, "Yxng23" with the page "ftpakks" advertising cocaine, firearms, machine gun conversion devices (MCD) for sale.

3. All controlled purchases during the duration of this investigation were conducted through the "ftpakks" telegram account.

4. On February 13, 2024, an APD Undercover (UC) #5456 conducted the first controlled purchase with Dominic Ramirez at Buffalo Wild Wings located at 1700 Towne Place Center SE, Albuquerque, NM. Ramirez arrived at the deal driving a 2008 Black Cadillac sedan with a New Mexico temporary tag, "24T021173".

5. Ramirez sold the UC three (3) grams of cocaine for $120. During the controlled purchase the UC and Ramirez discussed the future purchase of more cocaine and fully automatic firearms.

6. On March 1, 2024, the UC conducted the second controlled purchase with Ramirez at Burger King located at 5101 Gibson Blvd SE, Albuquerque, NM. Ramirez arrived at the deal in his Black Cadillac, with two other individuals. The front seat passenger was identified as Micah Maestas, and the back seat passenger was Daniel Garcia.

7. During the deal Maestas handed the UC a Glock firearm with a Glock switch machine gun conversion device ("MCD") attached, which is small device that can be attached to the rear of the slide of a Glock handgun, converting the semi-automatic pistol into a fully automatic one that falls within the definition of a machine gun under federal law. Ramirez handed the UC three (3) grams of cocaine. The UC then observed a second handgun on the passenger floorboard of the Cadillac. The UC asked if he could see the firearm and Maestas handed the UC the Glock. When the UC went to pay Ramirez for the firearm and cocaine, Maestas extended his hand and verbally indicated the money was for him, so the UC gave him $1300. Maestas started counting the money and handed then handed it to Garcia in the back seat.

8. Law enforcement conducted surveillance of the vehicle after the deal, and followed the vehicle to 807 Delamar Ave NW, Albuquerque, NM, which was later identified as the Maestas residence.

9. I identified the firearm as a Glock, model 30, .45 caliber pistol with serial number MCF005 with an MCD.

10. On May 3, 2024, the UC conducted a third controlled purchase with Ramirez at Buffalo Wild Wings located at 1700 Towne Center Place SE. Ramirez arrived at the deal driving in the black Cadillac with Garcia in the passenger seat.

11. During the deal Ramirez handed the UC a Glock pistol with a Glock Switch MCD attached and the UC gave Ramirez $1400. Garcia handed the UC three (3) grams of cocaine. The UC then observed Garcia pull out a grey Glock with a Glock Switch MCD attached with an extended thirty (30) round extended magazine. The UC asked Garcia about the firearm, and he stated the gun was not for sale. While the conversation continued Garcia was still handling the firearm. The UC observed him place the firearm on the floorboard of the vehicle, then under his leg and then finally he placed it inside the waist band of his pants.

12. Law enforcement continued surveillance on the black Cadillac after the deal and observed at least one transaction with another vehicle that was consistent with narcotics trafficking.

13. I identified the firearm as a Glock, model 19x, 9mm pistol bearing serial number AGKA188 on the frame and BYFR904 on the slide with a Glock switch MCD attached. The serial number on the slide returned as a stolen firearm. This firearm was test fired and entered into the National Integrated Ballistics Information Network (NIBIN).

14. On May 7, 2024, I was advised that the Glock that was purchased was linked to five (5) NIBIN leads: one (1) aggravated assault, three (3) shot spotter activations and one (1) shots fired at an occupied dwelling. The shooting at on occupied dwelling occurred on April 21, 2024.

15. On May 9, 2024, the UC conducted a fourth controlled purchase with Ramirez at Buffalo Wild Wings located at 1700 Towne Center Place SE. Ramirez arrived at the deal in a 2016 Chevrolet Silverado with NM license plate BPJZ30. Ramirez was in the back seat, Maestas was in the front passenger seat and the driver was identified as Oscar Ruiz Salmeron.

16. During the controlled purchase Ramirez handed the UC a rifle that was placed inside of a firearms box. Ramirez and Maestas showed the UC four (4) other firearms. The firearms were three (3) pistols, and at least one had an "invisible" MCD installed. Maestas told the UC he could install MCD's on all the firearms. Maestas also showed the UC an AK-47 pistol that he stated he modified the hardware attached to the firearm. Maestas also bragged to the UC about selling firearms "all day." The UC gave Ramirez $1100 for the rifle.

17. I identified the firearm as a Diamondback firearm, model DB15, 300 blackout caliber rifle with serial number DB2180406. I also noticed the upper receiver of the firearm was manufactured by Palmetto State Armory. The upper receiver was consistent with the firearm box that Ramirez gave the UC.

18. Around June 13, 2024, Ramirez sent the UC a video of a fully automatic firearm for sale. In the video it showed a person with a large portrait forearm tattoo firing the weapon out the window of a car as it drove down a street. The individual firing the

weapon was later identified as Jesus Ruiz Salmeron, based on the large portrait and roman numerals on this inside of his forearm.

19. On June 14, 2024, ATF agents were able to locate a potential area that the shooting could have taken place in the video. ATF SA Kristen Larsen and I walked along Odelia Rd NE in Albuquerque, NM. The area of road was just east of Albuquerque High School. SA Larsen, S.E.E.K. K9 Freya and I located seven (7) casings located on the road. These casings were collected and enter into NIBIN. These casings were linked through NIBIN with twelve (12) shootings, one (1) armed robbery with a gun shot wound on April 25, 2024, and eleven (11) shots fired between March 29, 2024, and April 5, 2024.

20. On July 3, 2024, the UC set up a fifth controlled purchase with Ramirez. The controlled purchase took place at Costco located at 1420 N Renaissance Blvd NE, Albuquerque, NM. The telegram account "ftpakks" stated they would be coming to the deal in a white car. I was monitoring the pole camera installed on Maestas residence located at 807 Delamar Ave NW and observed a white Toyota SUV leave around ten minutes before the controlled purchase.

21. Maestas arrived at the deal in a 2023 White Toyota 4Runner with NM license plate BTY032. Maestas showed the UC a Glock firearm and explained that it had an "invisible switch." The invisible switch is installed on the firearm to enable it shoot fully automatic but look flush with the rear plate of the firearm to be less detectable. Maestas explained to the UC that if he got pulled over by the cops that it is less detectable and sometimes the cops don't even know to look for it.

22. The UC paid Maestas $1300 for the firearm. The UC also asked about cocaine and Maestas stated he could have it in about ten minutes. Maestas also showed the UC a picture of cocaine on his cell phone. The UC asked how many more Glocks Maestas had and he replied, "infinite." He also stated that he has "AR-P's," which is referring to AR-15 pistols. According to Maestas, the Glocks he had but the AR-Ps were just a phone call away.

23. Law enforcement conducted surveillance of Maestas' vehicle after the deal and he returned back to his residence at 807 Delamar Ave NW.

24. I identified this firearm as a Glock, model 19, 9mm pistol with serial number BKKV311 on the slide and BXYR392 on the frame with a "invisible switch" MCD attached. The slide serial number BKKV311 returned as stolen. This firearm was test fired and enter into NIBIN. The firearm was linked through NIBIN to be the firearm fired in the June 13, 2024, video sent to the UC and to the twelve (12) prior shootings.

25. On July 13, 2024, "ftpakks" sent the UC photos on Telegram of Jesus Ruiz Salmeron, who is identified through the tattoo on his forearm holding an AR-15 style rifle. "ftpakks" then sent the UC a video of someone firing the fully automatic weapon but because of the lighting in the video I was unable to identify the shooter.

26. On July 15, 2024, law enforcement conducted surveillance on the residence of Oscar and Jesus Ruiz Salmeron located at 3707 12th St NW A1, Albuquerque NM (SUBJECT

7

RESIDENCE). Law enforcement observed Jesus Ruiz Salmeron leave in a black Chevrolet Camaro with New Mexico license plate APKD11. Law enforcement surveilled Jesus Ruiz Salmeron who travelled to the Maestas residence located at 807 Delamar Ave NW. Jesus Ruiz Salmeron was seen giving Maestas a large duffle bag and entering the residence. In my training and experience, I know that firearms are commonly transported in bags similar to the one law enforcement observed Jesus Ruiz Salmeron to possess at this time.

27. On July 16, 2024, law enforcement officers conducted surveillance at 3707 12th St NW A1 (SUBJECT RESIDENCE) and saw Jesus Ruiz Salmeron leave in the same black Camaro with license plate APKD11. APD Detective Leah Wise conducted a traffic stop on Jesus Ruiz Salmeron. Jesus Ruiz Salmeron was driving the black Camaro when he was stopped for speeding. During the traffic stop, Det. Wise was able to identify the tattoo on Jesus Ruiz Salmeron's right forearm. The tattoo is a portrait of his brother that passed away with roman numerals of the date of his passing. Based off the body worn camera footage I was able to confirm this is the same tattoo in the two prior videos sent to the UC of an individual firing fully automatic firearms.

28. On August 16, 2024, "Ftpakks" sent the UC a picture of Five (5) metal AR-15 Auto Sears for sale. The UC responded asked a the price. On August 20, 2024, "Ftpakks" responded with "1000." On August 25, 2024, "Ftpakks" said "lmk" which is slang for "let me know."

29. Through historical phone records ATF has confirmed that Micah Maestas, Dominic Ramirez, Oscar Ruiz Salmeron, Jesus Ruiz Salmeron and Daniel Garcia consistently contact each other.

30. Throughout July and August 2024, law enforcement has conducted surveillance at the SUBJECT RESIDENCE. Law enforcement has been able to identify Oscar Ruiz Salmeron's white Chevrolet Truck and the two black Camaros that have been driven by Jesus Ruiz Salmeron consistently at the SUBJECT RESIDENCE. On August 22, 2024, Det. Martinez positively identified Oscar and Jesus Ruiz Salmeron at the SUBEJCT RESIDENCE.

31. Based off my training and experience I know fully automatic sears are devices that allow firearms to be modify into machine guns. I also know that Glock switches and auto sears are devices that are externally and internally added to firearms to allow them to fire fully automatic. The manufacture, sell, or possession of these items without proper licensing is prohibited by federal law.

32. The ATF's Federal Firearms License (FFL) database was queried for a license connected with Micah Maestas, Dominic Ramirez, Jesus Ruiz Salmeron, Oscar Ruiz Salmeron, or Daniel Garcia. Certain classifications of FFLs would give the holder the legal authority to possess a machinegun. These types of FFLs are typically restricted to manufacturing and selling machine guns for law enforcement and military uses. None of the individuals have an FFL and are not listed as a "responsible party" on any FFL. A query was also conducted in the National Firearms Registry and Transfer Records (NFRTR) to determine if Micah Maestas, Dominic Ramirez, Jesus Ruiz Salmeron, Oscar Ruiz

Salmeron, or Daniel Garcia possessed any lawfully registered devices under the National Firearms Act of 1934. It was determined that none of the individuals have registered devices. There does not appear to be any lawful reason why Micah Maestas, Dominic Ramirez, Jesus Ruiz Salmeron, Oscar Ruiz Salmeron, or Daniel Garcia would be allowed to be in possession of a fully automatic weapon.

33. Based upon these facts, I believe that there is probable cause to search the residence located at 3707 12th St A1 NW, Albuquerque NM 87107, for any firearms and firearm related evidence, as described in Attachment B.

34. On September 10, 2024, your affiant obtained a federal arrest warrant for Micah Maestas, Dominic Ramirez, Oscar Ruiz Salmeron, Jesus Ruiz Salmeron, and Daniel Garcia for committing a combination of the crime(s) of 18 U.S.C. §§ 922 (a)(1)(A) and 924: Dealing of Firearms Without a License; 18 U.S.C. § 2: Aiding and Abetting; 18 U.S.C. § 922(o): Possession or Transfer of a Machinegun: 18 U.S.C. § 2: Aiding and Abetting; 21 U.S.C. §§ 841(a)(1), (b)(1)(C): Distribution of a Cocaine; 18 U.S.C. § 2: Aiding and Abetting; 18 U.S.C. § 924(c)(1)(A)(i): Using and Carrying a Firearm During and in Relation to a Drug Trafficking Crime, and Possessing a Firearm in Furtherance of Such Crime; 18 U.S.C. § 2: Aiding and Abetting; 18 U.S.C. § 933(a)(1), (a)(3), and (b): Conspiracy to Commit Trafficking in Firearms; and 18 U.S.C. § 933(a)(1): Trafficking Firearms; 18 U.S.C. § 2: Aiding and Abetting.

35. This warrant was reviewed and approved by Assistant United States Attorney Letitia Simms.

Respectfully submitted,

Katie M. Stamper
Special Agent
ATF

Electronically submitted and telephonically sworn to me, on this 11th day of September 2024.

HONORABLE JOHN F. ROBBENHAAR
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## DESCRIPTION OF PROPERTY TO BE SEARCHED

The residence is located at 3707 12th St A1 NW, Albuquerque NM 87107 (SUBJECT RESIDENCE). The SUBJECT RESIDENCE is a double-story multi-residence with a flat roof and light tan stucco. The front entrance of the SUBJECT RESIDENCE faces south. The subject residence is the apartment to the furthest east of the structure.

The search of the SUBJECT RESIDENCE shall include the entire residence, and all attached and unattached garages, outbuildings, trashcans, or storage containers designated for use by the SUBJECT RESIDENCE, and any vehicles parked at, in front of, or near the SUBJECT RESIDENCE that have an apparent connection to the SUBJECT RESIDENCE.

The search shall further include the white Chevrolet truck bearing plate NM BPJZ30, so long as the vehicle is located within the District of New Mexico.

## ATTACHMENT B

## ITEMS TO BE SEIZED

All evidence of violations of 18 U.S.C. §§ 922(a)(1), (a)(6) and (o), 933, and 841 including:

1) Firearms and evidence of firearm possession to include holsters, magazines, gun cases and firearm components. Ammunition, to include components of ammunition, such as primers, casings, and gun powder.

2) Safes, combinations or key-lock strong boxes or other secure storage containers, and types of locked or containers, and hidden compartments that may contain any of the foregoing;

3) Books, records, receipts, notes, ledgers and other documents relating to transporting, ordering, purchasing, manufacturing and/or distributing firearms, and fully automatic devices and parts.

4) Devices, machines, and printers or any equipment to help manufacture, produce or create firearms parts, including fully automatic devices and parts.

5) Controlled substances, including but not limited to cocaine.

6) Drug paraphernalia and packaging materials, scales, prescription boxes, hypodermic needles, plastic baggies, tin foil, or tape.

7) Financial documents, including credit card statements, tax returns, safe deposit records, safe deposit keys, bank records, bank statements, money orders, Western Union Money Gram or other currency transfer receipts, checking account records, cashier's checks, passbooks and other items evidencing the obtainment, concealment and/or expenditure of money.

8) Proceeds of violations of 18 U.S.C. §§ 922(a)(1) and (o), including bulk cash currency or financial records related thereto.

9) Cellular telephones, computers, cellular telephones, and digital storage media linked to Jesus and/or Oscar Ruiz Salmeron, including device contents, to include phone book or contacts list, call history, text messages between co-conspirators and customers to include SMS messages, multimedia messages, and messages transmitted via internet apps, for all such messages both incoming and outgoing, audio/video files, photographs, and any other material stored on the telephones that is related to the above listed offenses.

10) Articles of property tending to establish the identity of persons in control of premises, vehicles, storage areas, and containers being searched, including utility company receipts, rent receipts, addressed envelopes, and keys.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

This warrant authorizes a review of all electronic media seized pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The warrant also authorizes a review of all electronic media for evidence of who used, owned, or controlled the electronic media at the time the things described in this warrant were created, edited, or deleted. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, law enforcement may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the search of the SUBJECT RESIDENCE described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of Jesus and Oscar Ruiz Salmeron to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face(s) of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.